Argued and submitted September 27, 2021, affirmed February 24, 2022

In the Matter of L. W. H.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. H.,
*Appellant.*

Josephine County Circuit Court
18JU04203; A175513 (Control)

In the Matter of C. M. H.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. H.,
*Appellant.*

Josephine County Circuit Court
18JU04204; A175514

505 P3d 1064

Mother appeals from the permanency judgment changing the case plans for two of her children, C and L, from reunification to guardianship. She has two primary arguments. First, she argues that the trial court erred in entering the judgments because it failed to include all the findings required by ORS 419B.476. Mother acknowledges that she did not raise that issue below but contends that she had no practical ability to do so because it did not arise until entry of those judgments. Second, mother asserts that the court erred by concluding, as necessary to change the plan, that the reunification efforts of the Department of Human Services (DHS) were reasonable. *Held*: Mother had an opportunity to object to the lack of findings in the judgment, and any error was not plain because the court's oral findings were incorporated into the judgment. Further, the juvenile court did not err in concluding that DHS made reasonable efforts toward reunifying the family.

Affirmed.

Sarah E. McGlaughlin, Judge.

Kristen G. Williams argued the cause and filed the briefs for appellant.

Jona J. Maukonen, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Mother appeals from the permanency judgment changing the case plans for two of her children, C and L, from reunification to guardianship.[1] She has two primary arguments. First, she argues that the trial court erred in entering the judgments because it failed to include all the findings required by ORS 419B.476. Mother acknowledges that she did not raise that issue below but contends that she had no practical ability to do so because it did not arise until entry of those judgments. Second, mother asserts that the court erred by concluding, as necessary to change the plan, that the reunification efforts of the Department of Human Services (DHS) were reasonable. We conclude that mother had an opportunity to object to the lack of findings in the judgment and that any error is not plain because the court's oral findings were incorporated into the judgment. We further conclude that the juvenile court did not err in concluding that DHS made reasonable efforts toward reunifying the family. Accordingly, we affirm.

We review the juvenile court's determinations that DHS made reasonable efforts for errors of law. *Dept. of Human Services v. D. M.*, 310 Or App 171, 173, 483 P3d 1248 (2021). "Where findings on disputed issues of fact are not made but there is evidence supporting more than one possible factual conclusion, we presume the juvenile court decided the facts consistently with its ultimate legal conclusion." *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010). Ultimately, we review the facts found by the juvenile court to determine whether they are supported by any evidence and then to determine if, as a matter of law, those facts provide a basis for the juvenile court's change of the permanency plan from reunification to guardianship under ORS 419B.476. *Id*.

We review the facts accordingly. This case involves two of mother's five children, C and L. They and two other children, M and J, were removed from parents' custody by DHS based on parents' treatment of J and an older

---

[1] Father is not a party to this appeal.

half-brother who lived out of state.[2] While in parents' care, J was physically abused, neglected, locked in his room, handcuffed, restricted from food, and had not attended school for several years. Although the other three children were not mistreated in the same way, mother's other son, who has a different father, had suffered similar treatment while in parents' care and mother's parental rights to him had been terminated in Hawaii. The juvenile court took jurisdiction of C, L, and M based on allegations that parents failed to provide for J's basic daily needs, education, medical care, and nutritional requirements and that J suffered malnutrition in parents' care. Further, the jurisdictional allegations included that J suffered a nonaccidental injury that was at variance with the explanation given by parents and that the circumstances (physical abuse and neglect) that led to termination of mother's parental rights to J's half-brother had not been changed or ameliorated and interfered with her ability to safely parent all of her children. Moreover, parents were unable or unwilling to provide for the educational needs of L, who was removed from school due to behavioral issues.

Mother moved to dismiss jurisdiction and to terminate wardship over C, L, and M, and the juvenile court denied her motions.[3] During the hearing on those motions, DHS presented evidence that it had provided mother with services, including two psychological evaluations, mental health services, parenting services, in-home safety reunification services, a parenting coach, supervised visitation, family counseling, and ongoing case planning.

A psychologist, Clausel, on DHS's referral, evaluated mother and provided a report with recommendations for services to address the issues that he identified. He described mother as "an intellectually modest young woman functioning in the Borderline Mentally Retarded range." Clausel was extremely concerned that mother was not acknowledging parents' significant physical abuse, starvation, and neglect of mother's two oldest sons or father's abuse of mother. He was

---

[2] Mother has separately appealed the permanency judgment as to M in Case No. A175515.

[3] Mother also appealed from the judgments denying her motions to dismiss jurisdiction over C, L, and M, which were consolidated for appeal. Those appeals are currently pending for further briefing on DHS's motions to dismiss.

also concerned that mother was blaming J for the family's problems. As a solution, he encouraged mother to engage in therapy but cautioned that "this therapy should not be considered a forensic tool for further information gathering, but a highly private, highly confidential treatment component where she is free to fully, freely address these troubling parenting issues in an atmosphere of maximal privacy and trust." A second psychologist, Lake, expressed similar concerns about mother's need to acknowledge and address her role in the abuse of her two oldest sons.

Mother also participated in other services, including weekly therapy for over a year with her chosen therapist, Whittaker. However, mother did not address all of the issues identified by Clausel with her therapist. DHS provided Whittaker with a copy of Clausel's evaluation once it was completed (several months after Whittaker began treating mother), but Whittaker did not adjust her treatment plan based on that report. Whittaker disputed Clausel's diagnosis of mother but testified that she believed that her approach was consistent with Clausel's evaluation and that she was able to meet all of his recommendations. However, Whittaker's approach was primarily cognitive behavior therapy that addressed mother's stress, anxiety, and sleep habits, but did not address issues related to mother's role in the abuse of her two oldest sons. Whittaker concluded that mother had successfully completed treatment because mother could "sleep at night" and her anxiety was reduced.

Although mother's individual therapy did not engage the issues that Clausel recommended regarding abuse of her children, she was offered other services that would have served the same purpose. Mother was twice referred to Family Care Collaborative (FCC) which would have provided wraparound programming for the family. However, mother did not engage in services from FCC.[4] According to Lake, mother was not always forthcoming with the providers to which DHS referred her, and mother made clear to DHS that she would not acknowledge the abuse that happened to her two oldest sons.

_____

[4] Mother testified that she thought that FCC would not work with her because they were under the impression that father had moved back in with her. FCC disputes that claim.

At the permanency hearing, the court entered into evidence a recording of the hearing on mother's motion to dismiss. In an oral ruling at the end of the hearing, the court recalled the reports of Clausel and Lake and noted that its primary concern was consistent with Clausel's, that the "one-on-one counseling for [m]other to develop insight into the family dynamics and her relationship with [f]ather is key to [m]other being able to be protective and aware of dangerous situations to her children in the future." The court noted that Lake related a concern about mother's failure to develop independence from father.

The court went on to address whether DHS made reasonable efforts to reunify the family. It noted that it viewed the question as a close one and reasoned as follows:

> "Mother needs that kind of intensive counseling necessary for her to develop insight into her relationship with [f]ather and to develop the skills that will allow her to be more protective of her children in a home environment than protective of [f]ather and his psychological needs.

> "Both evaluators went into detail about the type of counseling this would take. *** Clausel's report also outlined the type of counseling that—or the type of topics that should be covered in counseling. What happened here, and this was raised by [mother's attorney] in his closing too, is that [m]other underwent over a year of counseling that was largely ineffective at addressing the core issue, which is the family dynamics. It addressed the sort of peripheral issue of the anxiety and the depression around the situation and around those unhealthy dynamics, but it didn't address the mechanism for harm for the children and so DHS's argument at our last hearing was that's why it was ineffective.

> "*****

> "And it is alarming to the court, having heard the testimony of *** Whittaker at trial, which is that she developed the course of treatment, several months later received a copy of *** Clausel's report, read *** Clausel's report, and then concluded it supported her course of treatment, which is that [m]other's primary problem was stress. And I don't know if *** Whittaker was misremembering, if she had forgotten that report, or if she was thinking about another case. That was clearly not what the report directed and it makes the court concerned that *** Whittaker is going to

be the counselor responsible for helping [m]other develop these skills and this course of treatment.

"However, I have also heard from [the DHS caseworker] that she has spoken with [m]other about what specifically *** Clausel is recommending and that the intention is to develop a course of treatment with *** Whittaker, [m]other, and then also the psychological evaluator so that it's very clear that [m]other's course of treatment actually addresses the dynamics and the issues that *** Clausel recommended."

The court noted that its finding as to reasonable efforts was close because DHS was aware of the determination that mother had borderline intellectual functioning. The court encouraged DHS to increase its role in helping mother find therapy that addressed the issues that Clausel recommended, but also found that the record did not indicate that mother was unable to understand or follow instructions. The court found that the efforts by DHS were reasonable but emphasized that, despite the changes in plans for the children from reunification to guardianship, services to mother would continue. DHS sought clarification, stating that "DHS holds the position that it will not and cannot tell a parent which therapist to engage with, but can provide information to that counselor on the best treatment plan." The court responded, "I'm not ordering that [m]other engage with a specific counselor, but that I would expect DHS to provide more active oversight to the course of treatment to make sure it is in compliance with *** Clausel's report, rather than relying on [m]other to relay that necessity to the counselor."

The court incorporated its oral findings into the written judgments, and DHS prepared and served mother with the judgments on January 15, 2021. Receiving no objection from mother, DHS submitted the judgments to the court a week and one-half later. The court signed and entered them later that day. Thus, mother had 10 days to review and object to the judgments before they were signed and entered.

On appeal, mother argues that the juvenile court erred by failing to include all findings required by ORS

419B.476(5)[5] in the permanency judgments. She acknowledges that she did not make that argument below but asserts that because the error did not arise until the judgments were entered, she was not required to raise the issue prior to entry of the judgments and had no practical ability to do so. She contends that the court's failure to include the required findings requires reversal and argues that incorporation of the oral findings made at the close of the hearing does not meet the express intent of the legislature that those findings be made in writing in the judgment. On the merits, mother contends that the court erred in concluding that DHS made reasonable efforts, arguing that DHS left it up to her to coordinate appropriate counseling services despite Clausel's diagnosis regarding her intellectual functioning. She maintains that she was not provided with a fair opportunity to benefit from counseling until the permanency hearing, when the court ordered the agency to make additional efforts.

DHS responds that mother's first assignment of error is unpreserved given mother's failure to object and that any error is not plain because the judgments incorporated the court's oral findings. It urges us to decline to exercise our discretion to reach any error because it could easily have been corrected had mother objected, and also because any error was harmless. DHS also argues that its efforts were reasonable, noting its communication with Whittaker and its efforts to assist mother in obtaining services, and also asserts that it was not "apparent that any individual counseling would have been successful because mother was not forthcoming with her providers."

We begin with mother's challenge to the form of the judgments. We must first determine whether mother's argument was preserved and, if not, whether it constitutes

---

[5] ORS 419B.476(5) states, in relevant part:

"The court shall enter an order within 20 days after the permanency hearing. In addition to any determinations or orders the court may make under subsection (4) of this section, the order shall include the following:

"(a) The court's determinations required under subsections (2) and (3) of this section, including a brief description of the efforts the department has made with regard to the case plan in effect at the time of the permanency hearing."

"error apparent on the face of the record," also known as "plain error." *State ex rel Dept. of Human Services v. M. A.*, 227 Or App 172, 180, 205 P3d 36 (2009); ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claimed error was preserved in the lower court * * *, provided that the appellate court may, in its discretion, consider an error of law apparent on the face of the record."). An error is "plain" if it is legal error, is not reasonably in dispute, and does not require consideration of matters outside of the record. *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). If the alleged error meets those requirements, we then must determine whether it is appropriate for us to exercise our discretion to correct the error. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991). In determining whether to exercise our discretion to consider an error of law apparent on the face of the record, we are instructed to consider

> "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.*, whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error."

*Id.* at 382 n 6.

When there is no "practical ability" to raise the issue below because the issue did not arise until the court entered the judgment, preservation is not required. *Dept. of Human Services v. H. P.*, 252 Or App 346, 350, 287 P3d 1175 (2012); *Peeples v. Lampert*, 345 Or 209, 220, 191 P3d 637 (2008). In *M. A.*, we determined that preservation was not required when mother's only opportunity to object to the court's judgment was after the court order was issued. We reasoned that, until that order was issued, the "mother had no way of knowing that the court would enter a judgment that did not comply with the statute." 227 Or App at 182; *see also H. P.*, 252 Or App at 351 (concluding the same and determining that the father "did not have a practical opportunity to object at the * * * hearing because the permanency judgment was not entered until *after* the hearing, and the

issue did not arise until the court entered the judgment on" (emphasis in original)).

This case differs from *M. A.* and *H. P.* because mother had 10 days to review and object to the permanency judgments before they were entered. Thus, she was required to preserve her claim and failed to do so. *Cf. State v. Hammond*, 218 Or App 574, 584, 180 P3d 137 (2008) (where a statute required findings to be made "on the record in open court," defense counsel had a "complete contemporaneous opportunity" to address the trial court's noncompliance; failure to do so rendered the defendant's claim of error unpreserved).

We next must determine if mother's unpreserved error meets the criteria for plain error and whether it is appropriate for us to exercise our discretion to correct the error. ORAP 5.45(1). Both parties reference *Dept. of Human Services v. L. B.*, 246 Or App 169, 265 P3d 42 (2011), to support their arguments. In that case, the mother argued that the court erred in entering a judgment changing the permanency plans for her children from reunification to adoption because it did not include the findings required by ORS 419B.476(5)(d). *Id.* at 172. We declined to resolve the parties' preservation dispute and decided to exercise our discretion to correct the plainly erroneous judgment because the "check box" forms of judgment provided to mother were confusing as to the findings required, in that none of the boxes within the "Compelling Reasons" section were checked; given the forms, we concluded that it was unsurprising that neither the parties nor the court discovered the error. *Id.* at 173-74. We were left to infer things beyond what the legislature intended, which was "that a juvenile court expressly connect all of the dots along the way to a change in the permanency plan." *Id.* at 175; *see also M. A.*, 227 Or App at 183 (explaining that ORS 419B.476(5) expresses the legislature's intent that "the trial court carefully evaluate DHS's decision to change a permanency plan for a child in order to ensure that the decision is one that is most likely to lead to a positive outcome for the child"). We concluded that, given the clear legislative mandate, the interests at stake, and the confusing form of judgment, the trial court erred,

and it was an appropriate case to exercise our discretion to correct those errors in the permanency judgments. *L. B.*, 246 Or App at 175; *cf. State ex rel Dept. of Human Services v. J. N.*, 225 Or App 139, 145, 200 P3d 615 (2009) (declining to exercise discretion to review the juvenile court's findings under ORS 419B.476(2)(d) where "it appears that the trial court *did* make the required findings in all but one respect, *viz.*, the number of schools attended. It is at least arguable that, in all other aspects, the written judgment, the court's oral findings, and its reference to incorporation of evidence in the record satisfied the statute." (Emphasis in original.)).

This case is distinguishable from *L. B.* Given that the court incorporated its oral findings into the judgment and those findings addressed DHS's reasonable efforts, we find no plain error here, and would decline to exercise our discretion to reach the issue in any event. Had mother objected, DHS or the court could have incorporated further written findings, and any error was harmless because the information that mother asserts was missing was readily discernible. *See, e.g., Dept. of Human Services v. C. C.*, 253 Or App 271, 276, 290 P3d 900 (2012) (failure to include statutorily required findings in a disposition judgment did not harm the parent where the information was provided elsewhere).

We turn to mother's challenge to the efforts made by DHS and conclude that the juvenile court did not err in concluding that those efforts were reasonable. To change a child's permanency plan away from reunification, the court must make certain determinations at the permanency hearing, including whether DHS has made reasonable efforts to make it possible for the ward to safely return home. ORS 419B.476(2)(a). DHS bears the burden to prove that its efforts were reasonable by a preponderance of evidence. *Dept. of Human Services v. L. A. K.*, 306 Or App 706, 716, 474 P3d 925 (2020). The type and sufficiency of efforts required varies and is highly dependent on the particular circumstances of each case. *Dept. of Human Services v. T. R.*, 251 Or App 6, 13, 282 P3d 969, *rev den*, 352 Or 564 (2012). Reasonable efforts are "efforts that focus on ameliorating the adjudicated bases for jurisdiction, and that give 'parents

a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents.'" *Dept. of Human Services v. L. L. S.*, 290 Or App 132, 138, 413 P3d 1005 (2018) (quoting *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 306, 388 P3d 1204 (2017) (internal quotation marks omitted)). The reasonableness of DHS's efforts depends on the totality of circumstances of the parent and child. *Dept. of Human Services v. D. M. D.*, 301 Or App 148, 156, 454 P3d 838 (2019).

Here, DHS allowed mother to choose her own therapist, despite its awareness of Clausel's diagnosis regarding her intellectual functioning. However, that decision was consistent with his recommendation for highly confidential treatment that would allow mother to address her issues in an "atmosphere of maximal privacy and trust." Moreover, DHS provided mother's therapist with a copy of Clausel's evaluation and she testified that she reviewed it and believed that her approach was consistent with what he recommended. Although one may dispute the therapist's testimony in that regard, we cannot conclude that any mistake by the therapist in applying Clausel's recommendation was attributable to DHS. Moreover, mother was also offered other services that would have also addressed the issues identified by Clausel but declined those services, and mother exhibited a pattern of not being forthcoming and denying the abuse of her two oldest sons. Under the totality of the circumstances, the juvenile court did not err in concluding that DHS made reasonable efforts to provide mother with services that would facilitate reunification, in accordance with Clausel's recommendations.

Accordingly, we affirm the juvenile court's judgment changing C's and L's plans from reunification to guardianship.

Affirmed.